**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 C 862** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Claimant Lisa S. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied her application for a period of disability and Disability Insurance Benefits ("DIBs") under the Social Security Act. 42 U.S.C. §§416(i), 402(e), and 423. The Commissioner has filed a cross-motion. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, Claimant's motion for summary judgment [14] is denied, and the Commissioner's motion for summary judgment [20] is granted.

**I. BACKGROUND**

    **A.    Procedural History**

On February 18, 2015, Claimant filed a disability application alleging a disability onset date of February 11, 2015. Her claim was denied initially and upon reconsideration. On

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Lisa S. as Claimant.

December 14, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant.  The Appeals Council denied review on December 13, 2018, making the ALJ's decision the Commissioner's final decision.  20 C.F.R. §404.985(d); *see also Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Claimant subsequently filed this action in District Court on February 11, 2019.

### B.    Medical Evidence

#### 1.    Evidence From Claimant's Treatment History

The medical record shows a treatment history for physical conditions such as asthma, heart disease that includes a myocardial infarction, and a number of other minor complaints.  Claimant, however, challenges the ALJ's consideration of her mental condition and not her severe physical impairments.[2]  The Court therefore only reviews the parts of the medical record and Claimant's testimony that concern her mental health.

Claimant experienced various traumas in her childhood in Cambodia, including having to live in a jungle for a period of time before escaping to Thailand and eventually to the United States.  Prior to her alleged onset date, she was hospitalized in September 2012 after she attempted to commit suicide by cutting herself with a knife.  She required 22 stitches but refused to take the antidepressant medication that was recommended to her.  (R. 600).  After she was released from the hospital, Claimant was periodically treated by psychiatrist Dr. Aqeel Khan until May 2014.  Dr. Khan's last treatment note of May 10, 2014 states that her depressive disorder was in partial remission and directed Claimant to continue taking the antidepressant medication Prozac.  (R. 324).  Dr. Kahn noted no suicidal ideation, a euthymic mood, logical

---

[2] The only exception to this is that Claimant complains that the ALJ failed to include all of her physical restrictions in the Step 5 hypothetical question that she submitted to the vocational expert.  That does not require a review of the medical record for the reasons described below, *infra* at Section III(D).

thought processes, and intact concentration and memory. (*Id*.). Claimant discontinued treatment with Dr. Khan after he asked her to go out with him socially. (R. 493).

Claimant next sought psychiatric treatment on October 1, 2015 with Dr. Gregory Hawley. Dr. Hawley stated that Claimant had stopped taking Prozac after she terminated her treatment with Dr. Khan. Claimant was experiencing tearfulness, anhedonia, and mild irritability at her initial consultation and expressed feelings of hopelessness, despair, and passive suicidal ideation. (R. 493). Dr. Hawley diagnosed her with a mood disorder, non-specific anxiety, post-traumatic stress disorder ("PTSD"), and assigned a GAF score of 50.[3] He prescribed Lexapro (sertraline) for depression, Zolpidem to improve her sporadic sleep, and recommended that she begin weekly psychotherapy sessions. (R. 496).

Claimant was somewhat improved at her next consultation on November 25, 2015. In particular, her suicidal ideation was "significantly reduced" and she had "no despair or agitation." (R. 487). Dr. Hawley increased the dosage of Lexapro, and Claimant reported on January 20, 2016 that her anxiety and mood symptoms were better controlled. (R. 970). Dr. Hawley stated that she was only at a "low" risk for suicide. (R. 971). These improvements continued to be present at the next session on May 5, 2016, and her irritability had been slightly diminished as well. (R. 967).

Claimant's symptoms, however, were not always progressively improved. She reported increased anxiety and mood problems in several subsequent consultations, and Dr. Hawley added the medication Abilify to her Lexapro on July 14, 2016. (R. 961-63). Claimant reported in August 2016 that her symptoms had "significantly improved" with this new medication. (R.

---

[3] "The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, 853 (7th Cir. 2014).

958).  She was more active at home and was better able to tolerate stress.  Those improvements

continued throughout the rest of 2016.  (R. 952-60).  Dr. Hawley increased dosages of Abilify

and Lamotragine, and Claimant reported on February 23, 2017 that she had additional

improvements with "irritability, sleep, and reactivity."  (R. 946).  Dr. Hawley noted in his last

treatment note of June 2, 2017 that Claimant continued to experience those improvements.  (R.

940).

      Many of Dr. Hawley's notes show that Claimant was also receiving individual therapy

with psychologist Dr. Brittany Snow.  A letter signed by Dr. Snow states that she began treating

Claimant on May 3, 2016, but the record does not contain any of her treatment notes.  Prior to

that, Claimant was also treated by psychologist Dr. Kelley Hird from August 2015 through the

start of treatment with Dr. Snow in May 2016.  Unfortunately, Dr. Hird's treatment notes are also

missing from the record.

### 2.      Evidence From the State Agency Experts

      On July 1, 2015, Dr. Howard Tin issued a report for the Commissioner on Claimant's

mental impairments.  He found that her affective disorders under listing 12.04 were severe and

that they created mild limitations in Claimant's activities of daily living ("ADLs") and social

functioning; a moderate restriction in maintaining concentration, persistence, or pace; and that no

episodes of decompensation had occurred.  Dr. Tin found that Claimant would experience a

number of additional limitations in her functioning.  These included moderate restrictions in

carrying out detailed instructions, maintaining regular attendance, and setting realistic goals on

her own.  Dr. Tin concluded that Claimant could carry out unskilled work and interact

appropriately with the public, work with supervisors, and respond appropriately to changes in her

work setting.  (R. 74-75).  Dr. Darrell Snyder confirmed these findings on reconsideration on

January 4, 2016, though he added a severe anxiety disorder under listing 12.06 to Claimant's mental impairments. (R. 88, 93).

On June 19, 2015, consulting expert Dr. John Brauer examined Claimant and issued a report. Dr. Brauer noted that Claimant told him that she was stressed because her son had dropped out of school; she believed her husband had been unfaithful; and she had suffered a heart attack. Claimant stated that she had tried to commit suicide in 2012 and had also attempted to do so in 2015. Claimant stated that she had no hobbies and was not socially active. Dr. Brauer noted that she was calm and alert, was well oriented to place and time, and her affect was generally appropriate. Claimant had not experienced any recent suicidal ideation and did not have homicidal thoughts. Her concentration was within normal limits, and she could perform digit span tests, and serial sevens with a slow response. However, Claimant's "general fund of knowledge" was poor, as was her capacity for abstraction. Claimant told Dr. Brauer that she did not believe she could manage her funds, and he agreed with that conclusion. Dr. Brauer found that Claimant's presentation of her condition largely reflected her real condition, which he diagnosed as an adjustment disorder with a depressed mood. (R. 413-16).

### 3. Evidence From Treating Physicians

Three treating psychological experts submitted statements about Claimant's condition. Two were merely brief statements that the ALJ considered as medical opinions. On October 1, 2015, Dr. Gregory Hawley undertook an initial mental evaluation of Claimant. He noted that she claimed to be suffering from "hopelessness, despair, and intermittent passive suicidal ideation." (R. 493). Dr. Hawley diagnosed Claimant with a mood disorder and anxiety and assessed a GAF score of 50. (R. 495-96).

On June 29, 2017, Dr. Brittany Snow issued a short "To Whom It May Concern" letter. Dr. Snow stated that she had treated Claimant for a major depressive disorder weekly since May 3, 2016.  Claimant had experienced symptoms such as suicidal ideation, depression, and anhedonia and was recommended to continue with therapy.

Treating psychologist Dr. Kelly Hird examined Claimant on August 18, 2015 and issued a mental health evaluation.  Dr. Hird stated that she was unable to use standard testing instruments on Claimant – who is of Cambodian origin – because her reading skills were too undeveloped to permit such tests.  Dr. Hird's evaluation consisted largely of a summary of Claimant's statements.  These include self-reports of a history of cutting and hitting herself; a depressed and irritable mood; feelings of helplessness and hopelessness; and a high level of anxiety in work settings.  Dr. Hird diagnosed Claimant with a major depressive disorder but did not make any functional assessments.

On June 16, 2016, however, Dr. Hird issued a formal mental functional assessment for Claimant.  Dr. Hird noted that she was "often suicidal" and was "very dependent on others for basic self care and decision making." (R. 561).  Dr. Hird also assessed far greater mental restrictions than the state-agency experts had done.  She found that Claimant had an "extreme" restriction in her ADLs and "marked" limitations in both social functioning and in her ability to maintain concentration, persistence, or pace.  (R. 563).  Accordingly, Dr. Hird found that Claimant would not be able to meet competitive standards in 17 out of 25 functional categories. These included her ability to understand detailed instructions, interact with the public, get along with co-workers, and make simple work decisions.  (R. 561-62).  Despite that, Dr. Hird concluded that Claimant's condition would "never" cause her to be absent from work.  (R. 564).

6

### 4.    Evidence From Claimant's Testimony

Claimant appeared at the administrative hearing on July 18, 2017 and described her

condition to the ALJ.  Claimant testified that she last worked on February 11, 2015, when she

passed out at her last job and did not return.  She stated that she could no longer work due to

asthma and a "problem with my health," which she clarified to mean a rash that comes on when

she is stressed.  (R. 25).  Claimant only briefly described the effects of her depression.  She

stated, for example, that without her psychotropic medications she experienced a "bad mood"

that left her "mad" with her three sons and made it difficult to be around others.  (R. 28-29).  She

was hospitalized in 2012 after trying to commit suicide by cutting herself and now scratches

herself when she feels nervous.  (R. 41-42).

Claimant also described a limited scope of her ADLs.  She has no friends and does not

socialize with anyone.  She does not open her email, and her husband pays all the bills.  (R. 32).

Claimant explained that she does "a little bit" in the kitchen but failed to describe what that

included.  (R. 33).  Claimant's husband confirmed that she ordinarily "just keep[s] to herself" at

home, does not like to be around other people, and rarely leaves home by herself.  (R. 49, 51-52).

### 5.    Evidence From the Vocational Expert

A vocational expert ("VE") was also present at the hearing.  The ALJ asked the VE at

Step 5 to consider a person of Claimant's age, education, and work history.  She also limited

such a person to Claimant's physical RFC and the following mental work restrictions:

> Due to mild restrictions in understanding, remembering, or applying information,
> mild limitations in interacting with others, moderate limitations in concentrating,
> persisting, or maintaining pace, and mild limitations in adapting oneself, and
> limiting the person to work that involved simple instructions, simple routine tasks,
> occasional changes in the workplace setting, and simple decision making.
> Starting with those restrictions, all the past work was at least semiskilled so that
> would not be available.  Would there be unskilled jobs and, if so, the numbers in
> the national economy?

(R. 55).  The VE testified that 20,000 jobs were available to such an individual as a routing clerk; 27,600 jobs were available as a bench assembler; and 39,300 jobs were available as an electronics worker.  (R. 56).

> ### C.     The ALJ's Decision

On December 4, 2017, the ALJ issued a decision finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability claims, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity after her alleged onset date of February 11, 2015.  Her severe impairments at Step 2 included coronary artery disease, asthma, a major depressive disorder, and PTSD.  Claimant also had the non-severe impairments of hypertension, anemia, hypothyroidism, and gastrointestinal reflux disease.  None of these impairments met or medically equaled a listing at Step 3 either singly or in combination.  As part of the Step 3 analysis, the ALJ applied the "special technique" set out in 20 C.F.R. § 404.1520a for evaluating mental disorders.  She found that Claimant suffered from a mild limitation in understanding, applying, or remembering information; in her ability to interact with others; and in her capacity for maintaining herself.  The Claimant had a moderate restriction in concentration, persistence, or maintaining pace.  No episodes of decompensation were present.

Before moving to Step 4, the ALJ considered Claimant's description of her symptoms and found that it was not fully supported by the objective record.  The ALJ also evaluated the medical opinions of several experts.  She assigned "great" weight to the state-agency psychologists, who found that Claimant suffered from mild limitations in her ADLs, social functioning, and in her ability to maintain concentration, persistence, or pace.  By contrast, the ALJ gave little or no weight to all of the psychologists who examined or treated Claimant.  These

included consulting expert Dr. Brauer, treating psychiatrist Dr. Hawley, treating psychologist Dr. Hird, and therapist Dr. Snow.

Based on these findings, the ALJ determined that Claimant had the RFC to carry out light work as that term is defined in 20 C.F.R. §404.1567(b), except that additional exertional and non-exertional restrictions were also found. These included mental limitations stemming from Claimant's severe disorders of depression and PTSD. The ALJ stated that Claimant would be "limited to work that involves simple instructions. She is limited to simple, routine tasks. She can have occasional changes in the workplace setting. She can have simple decision-making." (R. 105). After questioning the VE, the ALJ found at Step 4 that Claimant would not be able to carry out her past relevant work as a receiving clerk, inspector/adjustor, or as an order filler. After the ALJ posed her hypothetical question, the VE testified that Claimant would be able to work as a bench assembler, routing clerk, or an electronics worker. Based on that testimony, the ALJ found at Step 5 that Claimant was not disabled. (R. 100-113).

## II. LEGAL ANALYSIS

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in

substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i).
It then determines at step two whether the claimant's physical or mental impairment is severe
and meets the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).
At step three, the SSA compares the impairment or combination of impairments found at step
two to a list of impairments identified in the regulations ("the listings"). The specific criteria that
must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404,
Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the
individual is considered to be disabled, and the analysis concludes. If the listing is not met, the
analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional
capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The
SSA then determines at step four whether the claimant is able to engage in any of his past
relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.*
If the claimant cannot undertake her past work, the SSA proceeds to step five to determine
whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age,
education, and work experience. An individual is not disabled if he or she can do work that is
available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

**B. Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final
decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C.
§405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any
fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial
evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. DISCUSSION

Claimant argues that the ALJ erred by (1) finding at Step 3 that her mental impairments did not meet or equal listings 12.04 and 12.06; (2) assigning inappropriate weights to the expert reports of Dr. Hawley, Dr. Hird, Dr. Bauer, and the state-agency psychological experts; (3) fashioning an erroneous RFC; and (4) not including all of Claimant's limitations in the hypothetical questions posed to the VE at Step 5. For the reasons stated below, the Court disagrees with each of these claims.

### A. The ALJ Did Not Err at Step 3

The ALJ found at Step 3 that Claimant's mental disorders did not meet or medically equal listing 12.04 (depression) or listing 12.06 (anxiety). A claimant meets these listings, in relevant part, when she has one extreme or two marked limitations in the Paragraph B criteria of understanding information, caring for oneself, interacting with others, and in concentration,

11

persistence, or pace.[4]  As noted above, *supra* at Section I(C), the ALJ found that Claimant did not meet a listing because she had a moderate restriction in her concentration and mild limitations in the remaining Paragraph B factors.[5]

An ALJ is required to do three things at Step 3:  (1) identify the appropriate listing by name, (2) give more than a perfunctory analysis of the issues involved, and (3) "consider an expert's opinion on the issue."  *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *see also Cirelli v. Astrue*, 751 F.Supp.2d 991, 1002 (N.D.Ill. 2010).  Claimant concedes that the ALJ properly identified listings 12.04 and 12.06 but contests her compliance with the second and third of these requirements.

A listing discussion is perfunctory when an ALJ "provides nothing more than a superficial analysis" of the listing's criteria.  *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004).  Far from being perfunctory, the ALJ's discussion of Claimant's mental disorders at Step 3 was

---

[4] The listings contain three categories for evaluating mental impairments.  The Paragraph B factors are used to assess a claimant's functional limitations.  Because the ALJ's decision was issued in December 2017, she correctly referenced the new paragraph B criteria that apply to claims filed on, or claims that were pending as of, January 17, 2017.  *See* 81 Fed.Reg. 66,138 (Sept. 26, 2016).  The old paragraph B factors addressed a claimant's (1) activities of daily living, (2) social functioning, (3) ability to maintain concentration, persistence, or pace, and (4) episodes of decompensation.  The Court notes that Claimant mistakenly claims that the old Paragraph B factors apply in this case.  (Dckt. #15 at 5 n.3).

[5] The Commissioner emphasizes that Step 3 involves a "short cut" in a disability analysis.  *See Washington v. Barnhart*, 413 F.Supp.2d 784, 793 (E.D.Tex. 2006) (describing Step 3 as a "short cut" that can identify disability without moving to Step 4).  That has no relevance here because the ALJ did not find that Claimant met a listing at Step 3.  The Commissioner also argues that it is "simply impossible" for an ALJ's decision to be remanded on a listing issue as long as the analysis continues beyond Step 3 and properly addresses the claimant's functional capacity.  The Court rejects this assertion.  A number of decisions do what the Commissioner claims is "impossible": namely, remand SSA decisions based solely on a Step 3 error.  *See, e.g., Reynolds v. Comm. of Soc. Sec.*, 424 Fed.Appx. 411 (6th Cir. 2011); *Snell v. Comm. of Soc. Sec.*, No. 215 CV 11063, 2016 WL 1128421 (E.D.Mich. Feb. 17, 2016); *Cashin v. Colvin*, No. 1:12 CV 909, 2013 WL 3791439 (N.D.Ohio July 18, 2013).

comprehensive. She devoted substantial paragraphs to each of the functional areas of Paragraph B to find only mild or moderate restrictions in Claimant's understanding, remembering, or applying information; interaction with others; concentration, persistence, or pace; and ability to adapt and manage herself. The ALJ supported each of her conclusions by citing Claimant's testimony, her written function statements, the findings of medical experts, and some of her mental functioning test results. (R. 104).

Claimant overlooks everything that the ALJ stated on these issues and claims instead that the ALJ would have reached a different result if she had "properly investigated all the medical evidence of record." (Dckt. #15 at 5). However, Claimant makes no attempt to support this conclusory allegation: she neither cites any part of the record in her Step 3 argument nor challenges (or even acknowledges) the ALJ's Paragraph B assessments, and she mistakenly relies on the pre-2017 Paragraph B factors that do not apply to her case. (Dckt. #15 at 5 and n.5). Claimant cannot show that the ALJ incorrectly assessed the criteria of listings 12.04 and 12.06 by overlooking the ALJ's actual findings and citing no evidence to dispute them. *See Puffer v. Allstate Ins. Co*., 675 F.3d 709, 719 (7th Cir. 2012) (explaining that conclusory or undeveloped arguments are waived).

Claimant may have thought that she did not need to make an evidentiary argument because she asserts in her reply brief that the Commissioner has the burden to show that substantial evidence confirms the Step 3 analysis. In support, Claimant cites a regulation stating that the ALJ is the person "responsible for making the determination or decision about whether you [claimant] meet the statutory definition of disability." 20 C.F.R. § 404.1527(d)(1). This regulation only signifies that an ALJ is the person who decides whether a claimant meets a listing; it does not mean that the Commissioner has the burden of proof to justify an ALJ's Step 3

13

finding.  That onus rests with Claimant because the individual seeking disability benefits *always* "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citing *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir.1999)); *see also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (stating that a claimant "bears the burden of proof at steps one through four").  In fact, an ALJ does not err at Step 3 by failing to identify the appropriate listing when the claimant does not present evidence showing that she meets or equals a listing. *Knox v. Astrue*, 327 Fed.Appx. 652, 655 (7th Cir. 2009).

Claimant also argues that the ALJ failed to comply with the third Step 3 requirement because the ALJ did not call a medical expert to testify about listings 12.04 and 12.06 at the hearing and – according to Claimant – the ALJ "played doctor" by relying on her own medical judgment. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (stating that an ALJ may not "play doctor" and reach medical findings in the absence of supporting medical evidence).  While the Court agrees that an ALJ must consider an expert's opinion on the listing issue because it involves a medical judgment, *Barnett*, 381 F.3d at 670, Claimant overlooks that such medical evidence was present here even without a testifying expert.  In particular, the state-agency experts Dr. Tin and Dr. Snyder found that Claimant did not meet a listing because she had only mild or moderate limitations in her Paragraph B functional categories.  It is well established that an ALJ is entitled to rely on the findings of state-agency experts to decide whether a claimant meets a listing at Step 3. *See*, *e.g.*, *Sheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004); *Knox*, 327 Fed.Appx. at 655; *Csillag v. Berryhill*, No. 1:16 CV 02750, 2017 WL 5152697, at *1 (S.D.Ind. Oct. 3, 2017).  The ALJ considered their reports at a different point in her analysis, but

14

that does not require remand because "it is proper to read the ALJ's decision as a whole" instead of in discrete parts. *Rice*, 384 F.3d at 370.

Claimant does not address what the state-agency experts stated in their reports. Instead, she cites two cases that she claims show that the ALJ's Step 3 discussion was inadequate. She relies on *Wilder v. Chater*, 65 F.3d 335, 337 (7th Cir. 1995) for the proposition that "severe depression is not the blues. It is a mental illness" that must be assessed by a psychologist. That is what took place here, however, when Dr. Tin and Dr. Snyder evaluated her severe impairment of depression, and Claimant cites no evidence to dispute those findings for the reasons stated below in Section III(B)(4). Claimant also cites *Ribaudo*, 458 F.3d at 583, for the quote that an ALJ's "failure to make an assessment of . . . mental illness" requires remand at Step 3. (Dckt. #15 at 6). *Ribaudo* found that an ALJ's mere reliance on the opinions of the state-agency experts for the listing issue was insufficient when the ALJ (1) did not identify the relevant listing and (2) did not consider contrary evidence relevant to determining if the claimant met that listing. *Id*. By contrast, the ALJ in this case cited the appropriate listings for Claimant's mental impairments and assessed the Paragraph B factors at length in her "special technique" analysis. Claimant ignores that analysis, does not cite any contrary evidence in her Step 3 argument, and does not address any of the Paragraph B factors in her memorandum or reply.

If a claimant's impairment does not meet a listing, the ALJ must determine whether it is medially equivalent to one. Claimant argues that the ALJ did not address the combined effects of her physical and mental impairments on the equivalency issue. However, the ALJ plainly stated that she did not have an impairment or "combination of impairments" that equaled a listing. (R. 103). Claimant states that the ALJ's brevity on this issue requires remand, but SSR 17-2p makes clear that "a statement that the individual's impairment(s) does not medically equal

a listed impairment constitutes sufficient articulation for this finding." 2017 WL 3928306, at *4 (March 27, 2017). Claimant further argues – again, citing no evidence – that the combined effects of her physical and mental symptoms "may represent an equivalence" and "might" have led the ALJ to a different conclusion on this issue. (Dckt. #15 at 6-7). That fails to demonstrate error by the ALJ: courts do not address such undeveloped and speculative allegations, *Puffer*, 675 F.3d at 719, and a claimant cannot dispute an equivalency finding when she does not "make any serious effort to demonstrate equivalence[.]" *Ramos v. Astrue*, 674 F.Supp.2d 1076, 1092 (E.D.Wis. 2009).

Finally, Claimant revives her earlier claim that the ALJ "played doctor" when she did not call a medical expert to testify that Claimant's mental impairments did not medically equal a listing. This argument ignores SSR 17-2p, which replaced SSR 96-6p on the issue of medical equivalence. SSR 17-2p explains that "we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment." 2017 WL 3928306, at *4; *see also Marvin v. Comm. of Soc. Sec.*, No. 17-330, 2018 WL 4214339, at *3, n.3 (W.D.Mich. Aug. 10, 2018) (explaining that SSR 17-2p "has clarified that an ALJ is not required to obtain a medical expert's opinion before making a finding that an individual's impairments do not . . . equal a listing impairment"). Claimant's motion is therefore denied on the Step 3 issues.

**B.     The ALJ's Assessment Of The Experts' Reports Does Not Require Remand**

An ALJ must assign specific weights to the reports of medical experts. *See David v. Barnhart*, 446 F.Supp.2d 860, 871 (N.D.Ill. 2006) ("The weight given to a treating physician cannot be implied[.]"). When an opinion is not given controlling weight, "the ALJ must explain the weight given to the consulting physician's opinion." *Turner v. Berryhill*, 244 F.Supp.3d 852,

859 (S.D.Ind. 2017) (citing 20 C.F.R. §404.1527(e)(2)). The ALJ does so by considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) "other" factors such as an expert's familiarity with SSA guidelines. 20 C.F.R. §404.1527(c)(2)-(6); *see also Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009). [6]

In her motion, Claimant states in broad terms that the ALJ erred by not explicitly mentioning her consideration of each of these factors. The Commissioner responds by citing the unpublished opinion *Schreiber v. Colvin*, 519 Fed.Appx. 951 (7th Cir. 2013) to argue that the Seventh Circuit has not always required an ALJ to address all of the regulatory factors. Other published cases, however, have suggested that an ALJ should consider all of the checklist of factors provided under 20 C.F.R. §404.1527. *See, e.g., Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018); *Yurt v. Colvin*, 758 F.3d 850, 860-61 (7th Cir. 2014). The Court follows the directive of these precedential decisions but nonetheless finds that a remand is not required given the record in this case.

The weight given to an expert report is subject to a harmless error analysis, and courts "will not remand a case to the ALJ for further explanation if [it] can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013); *Musgrove v. Berryhill,* No. 17 CV 50117, 2018 WL 1184734, at *5 (N.D.Ill. Mar. 7, 2018) ("The harmless error analysis looks to evidence in the record to see if the court can

---

[6] New regulations removed the treating physician rule in 2017, but only for claims filed after March 27, 2017. 20 C.F.R. §404.1527c. For claims like plaintiff's that were filed before that date, the factors set out in 20 C.F.R. §404.1527 continue to apply.

predict with great confidence what the result will be on remand."). Here, the Court finds that the ALJ sufficiently accounted for the relevant regulatory factors for assessing an expert opinion, and the Court is confident based on its review of the record that the result would be the same on remand even if the ALJ were to consider the factors that Claimant asserts that she overlooked. Consequently, the Court finds for the reasons stated below that any error that the ALJ made in this respect with regard to her analysis of each expert's opinion is harmless.[7]

### 1. Dr. Hawley

Dr. Gregory Hawley began treating Claimant on October 1, 2015. He issued a four-page intake assessment on that date that contained the brief statement, "Axis V – GAF: 50." (R. 981). The ALJ assessed this score by giving it little weight. Claimant briefly notes that Dr. Hawley assessed a GAF of 50; her primary argument, however, is that the ALJ gave little weight to the entirety of Dr. Hawley's treatment notes. (Dckt. #15 at 10). She claims this assessment requires remand because the ALJ did not state that Dr. Hawley was a psychiatrist, did not account for the extent of his treatments, and did not properly address the contents of his notes. The Commissioner counters that the ALJ actually weighed the GAF score and properly assigned it little weight.

---

[7] Throughout her reply, Claimant objects to a number of the Commissioner's arguments on the basis that they violate the *Chenery* doctrine, which forbids an administrative agency from defending a decision on grounds that the agency did not use. *See S.E.C. v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). The Court does not address those objections because it has not considered any of the Commissioner's arguments that Claimant contends violate *Chenery*. The Court notes, however, that harmless error arguments do not fall within the constraints of *Chenery*. *See, e.g., Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010) (stating that "harmless error, which is applicable to judicial review of administrative decisions . . . is . . . an exception to the *Chenery* doctrine.") (citing cases).

The Court agrees with the Commissioner that the plain language of the ALJ's decision shows that she *only* weighed Dr. Hawley's GAF score of 50 and not his treatment notes.[8] (R. 109, "I give the GAF score of Dr. Hawley little weight"). She reasoned that (1) a GAF score is a "global assessment" that does not provide a meaningful picture of what a claimant can do in a workplace setting and (2) only represents a "snapshot" of an individual's functioning at the time of the assessment. (R. 109). The ALJ's reasoning is sound because many courts have cited the same language to reject the significance of GAF scores in assessing disability. *See*, *e.g.*, *Pontarelli v. Colvin*, No. 13 C 1015, 2014 WL 3056616, at *8 (N.D.Ill. July 7, 2014) (stating that "courts have rejected again and again the notion that GAF scores are anything other than momentary 'snapshots' of a claimant's functioning that cannot be used to assess an individual's overall functioning") (citing cases). GAF scores are designed to assess the appropriate treatment option for an impairment instead of a claimant's functional abilities. *See Warner v. Astrue,* 880 F.Supp.2d 935, 943 (N.D.Ind.2012). As the ALJ correctly understood, therefore, a GAF score is "not the equivalent of a doctor's opinion of functional capacity and is not treated as such by the regulations." *Jones v. Colvin,* 1 F.Supp.3d 874, 877 (N.D.Ind. 2014).

---

[8] The regulations state that only "medical opinions" have to be weighed, 20 C.F.R. §404.1527(c), and it is unclear whether Dr. Hawley's treatment notes contain any medical opinions. "Opinions" are defined as an expert's statements about "what you can still do despite your impairments(s)." 20 C.F.R. §416.913(a)(2). For adult mental impairments, that involves an assessment of a claimant's functional capacity in the Paragraph B factors for a mental impairment. 20 C.F.R. § 416.913(a)(2)(i)(B). The Court makes no finding as to whether Dr. Hawley's treatment notes should be interpreted to be "opinions," though he did not provide a formal functional analysis or issue an expert report. The point is that the ALJ did not construe his notes as providing an "opinion," and neither the Commissioner nor the Court has been able to determine that Claimant has contested (or even recognized) the ALJ's failure to do so. That waives any objection on this issue. In any event, even if the ALJ should have treated the notes as an opinion and weighed them, the notes do not show any greater restrictions in Claimant's mental functioning than the ALJ assessed for the reasons addressed below at Section III(B)(4). Thus, any error in failing to weigh the treatment notes was harmless. *See, e.g., Schreiber,* 519 Fed.Appx. at 560; *Wright v. Colvin,* No. 13 CV 6429, 2014 WL 4197852, at *9 (N.D.Ill. Aug. 25, 2014).

Claimant asserts that the ALJ did not address all six of the regulatory factors but the Court concludes based on its review of the record that her alleged failure to do so does not require remand on this issue. In particular, Claimant asserts that the ALJ did not mention that Dr. Hawley treated her for a one and one-half year period, (Dckt. #15 at 12), but this is inaccurate. (*See* R. 107, 109 (noting that Claimant was treated by Dr. Hawley between October 1, 2015 and June 2, 2017)). Claimant also asserts that the ALJ did not mention the exact number of times (13) that Dr. Hawley treated Claimant. (Dckt. #15 at 12). However, the ALJ explicitly referenced and commented upon five of these treatment sessions. (R. 107, 109). Furthermore, there is no basis in the record to find that the ALJ would have changed her analysis of the GAF score if she explicitly referenced the remaining treatment sessions because Dr. Hawley assessed the GAF score on the first of his 13 treatment sessions on October 1, 2015. The score was therefore based on his observations of her on that date and does not reflect anything beyond the October 1, 2015 consultation. In addition, Dr. Hawley removed the GAF score in his subsequent entries and never entered a new assessment.

Claimant points out that the ALJ did not explicitly refer to Dr. Hawley as a psychiatrist; however, the ALJ did recognize that Claimant "saw Gregory Hawley M.D. for her mental health." (R. 107). The most likely M.D. that a person would see for their "mental health" is a psychiatrist so it is hard to attach much significance to this particular objection. Claimant's objection might have some teeth and require remand had the ALJ discounted the GAF score based on an erroneous belief that Dr. Hawley was somehow unqualified to make it. However, the ALJ did not discount the GAF score for this reason. Her point was that GAF scores are uninformative about a claimant's overall functioning by their *nature.* That is presumably why the ALJ adopted language often used by courts to explain that GAF scores are inherently

unhelpful in assessing disability. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (stating that GAF scores are not indicative of disability).

The same reasoning applies to Claimant's last complaint that the ALJ did not review everything that Dr. Hawley stated about Claimant's condition. She claims that an ALJ must discuss "[a]ll findings in psychiatric notes," (Dckt. #15 at 9), but that is incorrect. As the Seventh Circuit has held: "[w]hile we have never required an ALJ to address every piece of evidence or testimony in the record, the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski*, 245 F.3d at 889. That is what the ALJ did in this case. Claimant ignores the fact that the ALJ did not discount the GAF score based on a lack of support in the record. She relied instead on the established principle that neither courts nor the regulations require an ALJ to consider GAF scores as indications of a claimant's functional capacities. *See Jones,* 1 F.Supp.3d at 877. Even if Dr. Hawley's other notes supported the GAF of 50, therefore, the ALJ would have still given it little weight because her reasoning was based on a principle of disability analysis instead of the record. Claimant's motion is denied on this issue.

### 2. Dr. Hird

Claimant also challenges the ALJ's assignment of "no" weight to treating psychologist's Dr. Kelly Hird's June 16, 2016 opinion. Dr. Hird assessed the most severe restrictions in Claimant's functioning of any expert. Using the Paragraph B factors that were in effect at the time of the report, she found that Claimant had an "extreme" restriction in her ADLs and "marked" limitations in both social functioning and her ability to maintain concentration, persistence, or pace. (R. 563). The ALJ rejected Dr. Hird's report on the grounds that (1) it was

internally inconsistent, (2) was not accompanied by Dr. Hird's treatment notes, and (3) was not supported by the record as a whole. (R. 110).

Claimant argues that the ALJ should have given controlling weight to this opinion and – reverting once again to the Step 3 issue – was required to find that Claimant was disabled because a person with the restrictions that Dr. Hird identified is considered to be functionally disabled under listings 12.04 and 12.06. The Court disagrees. A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and is "not inconsistent" with other substantial evidence. 20 C.F.R. §404.1527(c)(2). As shown below, the ALJ identified serious inconsistencies related to Dr. Hird's report. She therefore correctly decided that a full-scale analysis was required instead of giving the report controlling weight.

Claimant alleges that the ALJ failed to consider any of the six regulatory factors involved with this kind of assessment. (Dckt. #22 at 6). That is plainly not the case. It is true that the ALJ did not address the sixth factor of "other" issues, but Claimant does not identify anything under this topic that was relevant to the ALJ's decision. The ALJ also did not address the issue of laboratory findings or objective tests. Dr. Hird stated in her report, however, that written psychological tests could not be given to Claimant because of her limited ability to read and write English. Thus, it is unclear that there were laboratory findings or objective tests that Dr. Hird assessed but were not mentioned by the ALJ.

Furthermore, contrary to Claimant's contention, the ALJ did consider the remaining four factors. She directly addressed the length of Claimant's treatment with Dr. Hird by stating that it spanned the period of August 2015 through May 2016. (R. 110). Claimant complains that the ALJ did not consider Dr. Hird's specialty and erred by referring to her as Claimant's "therapist." Dr. Hird *was* her therapist, however, and the ALJ recognized her as a treating expert by referring

to her as "Dr. Hird" and as "Kelly Hird, Psy.D."  (R. 110).  *See*

https://www.psychology.org/resources/ differences-between-psyd-and-phd-in-psychology

(stating that a Psy.D. indicates a doctorate in clinical psychology) (last visited Aug. 19, 2020).

An ALJ is only required to "minimally articulate" her reasons for a treating source assessment,

*Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004), and it is unreasonable to conclude that

the ALJ – an expert in disability law – did not know that these credentials meant that Dr. Hird

was a psychological expert.  *See Michael C. v. Saul*, 408 F.Supp.3d 919, 926 (N.D.Ill. 2019)

(explaining that courts must apply "a common-sense reading" to disability decisions).

That leaves only the two factors concerning the opinion's internal consistency and its

consistency with the record, including the opinions of other experts.  Either of these issues can be

adequate for giving less weight to an expert report.  *See Skarbeck*, 390 F.3d at 503 ("An ALJ

may discount a treating physician's medical opinion if it is inconsistent with the opinion of a

consulting physician . . . or when the treating physician's opinion is internally inconsistent[.]").

The ALJ addressed both factors in her decision.  She first determined that Dr. Hird's report was

internally inconsistent.  As noted, the finding of two marked and one extreme limitation was

tantamount to a conclusion that Claimant was disabled under listings 12.04 and 12.06.  A

disabled person is presumed to be unable to work on a full-time basis.  Contrary to that, Dr. Hird

stated that Claimant's mental restrictions would never cause her to *miss* work.  The Court agrees

with the ALJ that this constitutes a fatal inconsistency because a person cannot logically be both

disabled and have an impairment whose symptoms would never require her to miss work.

Claimant suggests that the ALJ rushed to judgment on this topic, but she provides no explanation

of what that means or how Dr. Hird's contradictory statements can be reconciled.

The ALJ also reasoned that Dr. Hird's report was inconsistent with the record as a whole. She noted that Dr. Hawley stated in his intake evaluation that Claimant had a low level of distractibility. (R. 494). The ALJ concluded that was inconsistent with Dr. Hird's finding that Claimant had a marked limitation in social functioning and concentration, persistence, or pace. Claimant suggests that this was insufficient and quotes *Roddy v. Astrue*, 705 F.3d 631, 636-37 (7th Cir. 2013) for the proposition that "internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion, but the reasoning for the denial must be adequately articulated." (Dckt. #22 at 6). *Roddy* does not contain that statement, however, and Claimant has not shown why the ALJ's articulation of her reasoning was insufficient.

Claimant also selectively cites Dr. Hawley's treatment notes in an attempt to show that they support the serious functional restrictions that Dr. Hird assessed. In reality, they frequently contradict them. Dr. Hird found, for instance, that Claimant could not interact appropriately with others or maintain appropriate behaviors. (R. 562). By contrast, Dr. Hawley repeatedly described her as courteous, smiling, and "pleasant and cooperative" with good eye contact. (R. 959 and 941, 944, 947, 950, 953, 956, 981). Dr. Hird also said that Claimant had "illogical thinking," but Dr. Hawley thought it was "logical and coherent, sequential, [and] goal directed" without "loose associations." (R. 956). Contrary to Dr. Hird's finding of a marked restriction in Claimant's concentration, Dr. Hawley said that she had "good attention, focus, and initiative." (R. 981). That echoed Dr. Brauer's finding that Claimant's attention and concentration were "within normal limits." (R. 415).

The ALJ cited many of these findings in her decision. (R. 108). One relevant entry that she did not account for was Dr. Hawley's statement in his first and second treatment notes in October and November 2015 that Claimant expressed hopelessness and despair. (R. 976, 979).

24

Even there, however, Dr. Hawley concluded that Claimant was only mildly depressed or anxious and showed no agitation in her initial consultation. Exacerbations in her symptoms existed over the course of therapy, but she was better in January 2016; "significantly improved" by August 2016; and "improved" in February and April 2017. No claims of hopelessness or despair are noted following these initial notes. These notes also contradict Dr. Hird's conclusion that Claimant was "often suicidal." (R. 561). Dr. Hawley stated during his first consultation that she had no suicidal thoughts and experienced only "occasional and intermittent passive suicidal ideation." (R. 979, 981). Her suicidal ideation was "significantly reduced" by her next session in November 2015. (R. 973). Dr. Hawley noted "nonspecific suicidal ideation without plans or intent" in July 2016, (R. 961), but none was found in January, May, August, or December 2016, or in any of the 2017 notes.

The ALJ also discounted Dr. Hird's report because none of her treatment notes were in the record to support her findings. She was entitled to consider that fact because "an ALJ can reject a doctor's opinion if it is not supported by treatment notes." *Ephrain S. v. Berryhill*, 355 F.Supp.3d 738, 746 (N.D.Ill. 2019) (citing cases). Without these notes, the only other evidence from Dr. Hird was an August 18, 2015 psychological assessment. (R. 566-67). The ALJ did not believe that this evaluation supported Dr. Hird's report because it "simply listed all of the claimant's allegations and did not even report any examination findings." (R. 110). That accurately characterizes the evaluation, which merely compiled Claimant's subjective complaints and then diagnosed major depression without assessing any functional restrictions that stemmed from it. The ALJ's remark on this document must be read in the context of her statement in another part of her decision that a psychologist can evaluate the Paragraph B categories based on a mental status exam. (R. 109). Her criticism was based on the fact that Dr. Hird did not do

anything like that in her August 2015 evaluation.  The ALJ therefore properly relied on the internal inconsistency of the report and its lack of support from the general record.  Substantial evidence supports the ALJ's assessment, and Claimant's argument that remand is required based on this issue is rejected.

### 3.  Dr. Brauer

The ALJ gave little weight to the examining psychologist Dr. Brauer's June 19, 2015 report.  The ALJ noted that Claimant told Dr. Bauer during her exam that she could not manage her own money because of impulsive spending.  Dr. Brauer accepted her statement and found that she "appears to be unable to manage funds on her own behalf, if funds are granted to her." (R. 415).  However, on April 24, 2015 – only two months prior to her interview with Dr. Brauer – Claimant stated the opposite in her written function report; she claimed that she could pay bills, count change, handle a savings account, and use a checkbook.  She further stated that her impairments had *not* changed her ability to handle money and made no mention of impulsive spending.  (R. 220). The ALJ reasoned that this inconsistency meant that Dr. Brauer's report should be given little weight.  (R. 110).

Claimant only briefly challenges the ALJ's finding by claiming that her reasoning was not "logical," though she appears to mean that it was insufficiently developed.  Claimant relies on *Beardsley v. Colvin*, 758 F.3d 834 (7th Cir. 2014), in which an ALJ gave preference to a non-examining expert (who found that the claimant was not disabled) over the SSA's own examining source (who assessed disability).  Noting the rarity of such a finding by an expert hired by the SSA, *Beardsley* stated that the ALJ did not sufficiently discuss her reasoning.  *See id.* at 839 ("[D]iscounting the opinion of the agency's own examining physician that the claimant is disabled, as happened here, can be expected to cause a reviewing court to take notice and await a

26

good explanation for this unusual step.").  Claimant's reliance on *Beardsley* is misplaced,

however, because – unlike the SSA examiner in *Beardsley* – Dr. Brauer did not find that

Claimant was disabled.  That meant that the ALJ was only required to minimally articulate her

reasoning about his report, which she did.  *Skarbeck*, 390 F.3d at 504.

Claimant's only other objection is that the ALJ should have applied the regulatory factors

to Dr. Brauer's report more carefully, but she does not address any of them or explain what it

was that the ALJ should have considered differently.  Despite the conclusory nature of this

statement, the Court's review of the record persuades it that the ALJ would not alter her decision

if this issue were remanded.  Even as it stands, the ALJ touched on several of the most important

regulatory issues.  She cited Dr. Brauer's credentials as "John Brauer, Psy.D" and already knew

that he was a psychological expert like Dr. Hird and the state-agency experts.  A further

discussion of this factor could not have revealed any greater expertise that the ALJ overlooked.

She also stated that he had only examined Claimant once at the SSA's request, which would

support assigning Dr. Brauer lesser weight had the ALJ addressed it more fully.  Claimant does

not identify any issue that could have been considered as part of the sixth factor.

The ALJ relied on the regulatory factor on the consistency of an expert report with the

record.  Claimant states that the ALJ was prohibited from considering inconsistencies in her

testimony because only medical evidence is relevant to this issue.  That is incorrect because the

Seventh Circuit has explained that "[a]n ALJ may properly reject a doctor's opinion if it appears

to be based on a claimant's exaggerated subjective allegations."  *Dixon v. Massanari*, 270 F.3d

1171, 1178 (7th Cir. 2001); *see also Butler v. Astrue*, 773 F.Supp.2d 975, 981 (D.Ore. 2011).

That is what the ALJ did by contrasting Claimant's statement to Dr. Brauer with her remarks two

months earlier that she had no problems handling money and that her impairments had not

affected her ability to do so. In fact, another potential exaggeration was present in Dr. Brauer's report. Claimant told Dr. Brauer that she tried to commit suicide in April 2015 in addition to the 2012 attempt that she described at the hearing. (R. 413). She did not mention a second suicide attempt at the hearing, however, and never made this serious claim to Dr. Hawley in October 2015. (R. 981, stating that there had been "no" prior suicide attempts). Claimant has not cited anything in the record to support this allegation that clearly touches on the severity of her mental condition.

The ALJ also considered the factor concerning objective data such as lab results and tests by addressing the verbal tests that Dr. Brauer applied during the consultation. She noted, for example, that Claimant was only able to calculate serial sevens at a slow pace. Claimant suggests that had ominous implications that the ALJ overlooked, but in reality Dr. Brauer stated that it showed that her concentration and attention were "within normal limits." (R. 415). The ALJ also noted that Claimant was able to recall 5 numbers forward and 3 backwards. (R. 107). In addition, Dr. Brauer stated that one of his tests indicated that Claimant's "fund of knowledge appears to be impoverished," but Dr. Hawley contradicted that finding by noting that her "fund of knowledge [is] normal." (R. 415, 981).

In addition, if this issue were remanded to the ALJ, the Court's review of the record provides it with no reason to believe that the ALJ would change her decision to reject Dr. Brauer's diagnosis of Claimant's mental impairment. In particular, Dr. Brauer contradicted every other examining expert by finding that Claimant suffered from an "adjustment disorder with a depressed mood." (R.416). Dr. Hird and Dr. Khan diagnosed her with major depression; Dr. Brauer assessed anxiety, PTSD, and an unspecified mood disorder that was "likely" major depression. (R. 981). The ALJ recognized Dr. Brauer's diagnosis, (R. 107), but disagreed with

it at Step 2 by assessing a major depressive disorder and PTSD. Depression and adjustment disorder constitute different psychological impairments, *see Anzivino v. Saul*, --- F.Supp.3d ---, 2020 WL 1540654, at *8 (S.D.Iowa March 21, 2020), where adjustment disorder signifies "a less serious level of depression." *Konz v. Comm. of Soc. Sec.*, No. CIV 08-5003, 2010 WL 760467, at *17 (D.Minn. Mar. 3, 2010). Consequently, the Court finds that any error by the ALJ with respect to analysis which led to the rejection of Dr. Brauer's diagnosis of Claimant's mental impairment is harmless.

### 4. The State Agency Experts

Finally, Claimant contends that the ALJ erred by giving great weight to the state-agency psychological experts. The ALJ reasoned that Dr. Tin's and Dr. Snyder's opinions were consistent with the record as a whole, including Claimant's statements in her written function report; Claimant's mental functioning had been improved with the psychotropic medication that was prescribed; and Dr. Tin and Dr. Snyder were familiar with the standards used by the SSA in evaluation disability. Claimant does not rely on the regulatory factors to attack the ALJ's assessment of the state-agency doctors in either her motion or reply. (Dckt. #15 at 13; Dckt. #22 at 7). Instead, she argues that the ALJ erred because these experts did not have Dr. Hawley's treatment notes before them when they issued their reports.[9]

---

[9] Even if she had raised this issue, any error that may be present is harmless. Like all state-agency experts, Dr. Tin and Dr. Snyder were non-examining sources with no treatment history of Claimant. Those factors work against the ALJ's finding, as they always do with non-examining sources. Nevertheless, both sources were psychological experts, (R. 75, "Howard Tin, PSYD"; R. 93, "Darrell Snyder, Ph.D."), whose relationship with the SSA presumes significant familiarity with the standards for disability. *See Ambrosini v. Astrue*, 727 F.Supp.2d 414, 427 (W.D.Pa. 2010). The ALJ addressed that factor as well as the reports' consistency with the record as a whole. There are no written psychological tests in the record, and the state-agency experts were familiar with the tests in Dr. Brauer's report because they reviewed it for their assessments.

Claimant appears to believe that giving greater weight to a non-examining source than to a treating expert is *per se* erroneous whenever the medical record exceeds what the non-examining source reviewed. That is incorrect because an ALJ is only prohibited from relying on a state-agency doctor's assessment "if later evidence containing new, significant medical diagnoses *reasonably could have changed the reviewing physician's opinion*." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (citing *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018)) (emphasis added); *see also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2018) (remanding where a later diagnostic report made the state-agency opinion outdated). Contrary to this standard, Claimant does not explain what it is in Dr. Hawley's notes that would have altered the state-agency doctors' findings. Indeed, she does not take note in her motion or reply of *anything* that Dr. Tin or Dr. Snyder said about her functioning. Claimant cannot reasonably argue that Dr. Hawley's notes would have led to a different result when she ignores what the state-agency experts stated and draws no link between their reports and Dr. Hawley's notes.

That said, the Court's own review of the record confirms that these notes would not have altered the state-agency's findings or the ALJ's assessment of them. Like the ALJ, the state-agency doctors said that Claimant had a moderate restriction in concentration, persistence, or pace. The listings define a "moderate" mental restriction as one that allows a claimant to operate on a "fair" basis in a functional category. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(F)(2)(c). Dr. Hawley's notes do not suggest any greater limitation in the area of concentration. The psychiatrist stated in his first treatment note in October 2015 that Claimant's concentration was "limited" – which a moderate restriction necessarily implies – but clarified that she still had "good attention, focus, and initiative." (R. 979, 981). Moreover, Dr. Hawley removed the "limited" finding in each of his subsequent treatment notes but continued to state in all of them

that she had "good attention, focus, and initiative." He did not find serious deficiencies in Claimant's memory or cognitive functioning; she only had a "mild" limitation in distractibility and forgetfulness, and her thought process was "logical and coherent, sequential, [and] goal directed." (R. 980-81). Claimant's "memory [was] intact to immediate, short, and long term information," and she had "fair intelligence without focal cognitive deficits." (R. 981). These findings were congruent with Dr. Brauer's conclusion that Claimant's concentration and attention were normal – a finding that the state-agency doctors had before them when they issued their reports.

Dr. Tin and Dr. Snyder also found a mild limitation in ADLs. The ALJ credited that assessment by citing Claimant's written function report. (R. 108). It is unclear why Claimant believes that Dr. Hawley's notes contradict these findings because the notes do not address Claimant's day-to-day activities such as cleaning, cooking, or bathing. Moreover, the ALJ discussed Claimant's ability to adapt and manage herself as part of the "special technique" analysis at Step 3. Claimant has not addressed any of the ALJ's findings on the Paragraph B issues or her ADLs.

The state-agency doctors found a mild limitation in Claimant's social functioning. The ALJ accepted that assessment based on medical entries stating that Claimant had good eye contact and had developed good relations with medical staff. (R. 108). Instead of contradicting those statements, Dr. Hawley confirmed them by pointing out Claimant's "good eye contact" and her "pleasant and cooperative" attitude. (R. 956). It is true that his notes also recount Claimant's complaints of conflict with various family members. The state-agency experts, however, already knew of Claimant's intra-family conflicts even though they did not have access to Dr. Hawley's later notes; Dr. Brauer – whose report they reviewed – noted the stress that she experienced in

her relations with her son and husband.  (R. 413-16).  In addition, the ALJ herself was aware that Claimant complained of "family stressors" to Dr. Hawley and stated that "her complaints are mainly with her family (her husband and her adult son)."  (R. 107, 108).  The ALJ had therefore already considered this aspect of Dr. Hawley's notes when she gave great weight to the state-agency reports.  Her reasoning on the issue was brief, but "[a]n ALJ must only minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (internal quotes and citation omitted).

Having failed to address anything that the state-agency experts said about Claimant's functioning, Claimant has failed to demonstrate how Dr. Hawley's treatment notes prevented the ALJ from giving great weight to their reports.

### C.  The ALJ Adequately Explained the RFC Assessment

The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments.  *Young*, 362 F.3d at 1000.  The task of assessing a claimant's RFC is reserved to the Commissioner instead of to a medical expert. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).  "In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do."  *Id*.  Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; the reports of activities of daily living; medical source statements; and the effects of the claimant's symptoms.  SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

Claimant challenges the RFC on the general ground that the ALJ failed to carry out a function-by-function analysis as part of the RFC.  That misstates what an ALJ is required to do. An ALJ must *consider* a claimant's ability to work on a function-by-function basis but is not

obligated to specifically *explain* each functional area in the manner that Claimant argues. "Although the 'RFC assessment is a function-by-function assessment,' SSR 96–8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient[.]" *Knox*, 327 Fed.Appx. at 657 (emphasis added) (citing cases); *see also Jeske v. Saul*, 955 F.Supp.3d 583, 596 (N.D.Ill. 2020); *Wurst v. Astrue*, 866 F.Supp.2d 951, 962 (N.D.Ill. 2012) ("Regulation requires an ALJ to consider, not articulate, the RFC on a function-by-function basis.").

Claimant has made no showing of why the ALJ's consideration of her "symptoms" and "medical source opinions," *Knox*, 327 Fed.Appx. at 657, was inadequate to meet this standard. The ALJ discussed Claimant's "symptoms" and "medical source opinions" concerning her mental impairments and stated that their combined effects limited Claimant to "simple, routine tasks and no more than occasional changes in a workplace setting." (R. 107). Claimant may wish that the ALJ had considered the evidence concerning her mental impairments differently, but a "court is not to reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (internal quotes and citation omitted). Having failed to explain what it was that the ALJ should have considered differently on the RFC issue – or why the ALJ would have reached a different decision had she done so – Claimant has not shown that remand is required on this issue.

### D. The ALJ Did Not Err at Step 5

If a disability analysis proceeds to Step 5, an ALJ is required to pose a hypothetical question to a VE that incorporates the exertional and non-exertional restrictions that are included in a claimant's RFC. "Ordinarily, a hypothetical question to the vocational expert must include

all limitations supported by medical evidence in the record." *Young*, 362 F.3d at 1003. Claimant challenges the ALJ's question in this case on two grounds. First, she claims in a conclusory manner that the ALJ failed to account for limitations related to her "asthma, coronary artery disease, dizziness, fainting spells, headaches, depression, and PTSD." (Dckt. #15 at 15). The Court is unable to follow the basis of Claimant's reasoning on this issue. The ALJ included limitations in the hypothetical question such as no climbing of ropes and ladders, light work, no exposure to humidity or respiratory irritants, no work at unprotected heights, and no operation of heavy machinery. (R. 55). The ALJ also included mental restrictions such as simple instructions, routine tasks, and occasional changes in the work place. (R. 55). The ALJ correctly noted that most of Claimant's medical record concerned her asthma, and she assigned specific work restrictions related to that impairment. (R. 107). The ALJ also addressed dizziness, headaches, and fainting spells but concluded that "no compelling complaints of these problems [exist] within one year of her alleged onset date." (R. 108). Claimant does not contest these findings or explain what additional limitations the ALJ should have described to the VE for either her physical or mental conditions.

Second, Claimant argues that the ALJ did not properly account for her moderate restriction in concentration, persistence, or pace when she told the VE to consider a person limited to "simple instructions, simple routine tasks, occasional changes in the workplace setting, and simple decision making." (R. 55). The Court disagrees. It is well settled that a moderate restriction in concentration must be specifically accounted for in a hypothetical question – a seemingly simple requirement that has yielded extensive litigation. *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). An ALJ does not have to explicitly state that a claimant has a "moderate restriction" because "there is no magic words requirement." *Crump v. Saul*, 932 F.3d

34

567, 570 (7th Cir. 2019). However, an ALJ cannot satisfactorily account for a moderate mental restriction merely by telling a VE that a person should be limited to "simple" or "routine" work. *Yurt*, 758 F.3d at 858–59 ("But we have repeatedly rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.") (citing cases).

The Seventh Circuit has explained that "[t]he best way" of accounting for a moderate limitation in concentration is "by including the specific limitations – like CPP [concentration, persistence, or pace] – in the hypothetical." *Crump*, 932 F.3d at 570. Claimant overlooks that the ALJ chose this common-sense method by telling the VE that the hypothetical individual had "moderate limitations" and by describing the restrictions associated with them:

> Due to mild restrictions in understanding, remembering, or applying information, mild limitations in interacting with others, *moderate limitations in concentrating, persisting, or maintaining pace*, and mild limitations in adapting oneself, and limiting the person to work that involved simple instructions, simple routine tasks, occasional changes in the workplace setting, and simple decision making. Starting with those restrictions, all the past work was at least semiskilled so that would not be available. Would there be unskilled jobs and, if so, the numbers in the national economy?

(R. 55) (emphasis added). This language satisfied the ALJ's obligation to convey either directly, or "in different words, the idea that [a claimant] had experienced moderate difficulties in concentration persistence, or pace." *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017) (internal quotes omitted); *see also Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) ("[W]e cannot look at the *absence* of the phrase 'moderate difficulties with concentration, persistence, and pace' and feel confident this limitation was properly incorporated in the RFC and in the hypothetical question.") (emphasis in original); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that

35

the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical.").  Consequently, Claimant's argument regarding this issue does not require remand.

## CONCLUSION

For these reasons, Claimant's motion for summary judgment [14] is denied.  The Commissioner's motion for summary judgment [20] is granted.  The case is dismissed.

ENTER:

**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated:  September 4, 2020**